Mark R. Pachowicz (SBN 138108)
LAW OFFICES OF MARK PACHOWICZ
A PROFESSIONAL LAW CORPORATION
771 Daily Drive, Ste. 230
Camarillo, CA 93010
Telephone: (805) 987-4975
Facsimile: (805) 987-4980
E-mail: mark@pachowicz.com

Sonia M. Mercado (SBN: 117069)
SONIA MERCADO & ASSOCIATES
5711 West Slauson Ave., Suite 100
Culver City, CA 90230
Telephone:   (310) 410-2981
Facsimile:   (310) 410-2957
E-mail: soniamer2002@yahoo.com

Counsel for Tyler Willis

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYLER WILLIS,<br><br>       Plaintiffs,<br><br>   v.<br><br>ANTHONY D. VASQUEZ, MARK V. FARINO, PEDRO L. GUERRERO, ET AL<br><br>       Defendants. | CASE NO. CV 10-7390 JAK (DTBx)<br><br>**DECLARATION OF MARK R. PACHOWICZ IN SUPPORT OF PLAINTIFF TYLER H. WILLIS' MOTION FOR ATTORNEYS' FEES**<br><br>DATE:      April 21, 2014<br>TIME:      1:30 p.m.<br>COURTROOM: 750 |

I, MARK PACHOWICZ, declare:

     1.  I am an attorney licensed to practice law in all state courts in California and have been since 1988.  I have been licensed to practice in the Federal Central District court since 1992 and in the Eastern District of California since 2005.  I am the Principal at the Law Offices of Mark R. Pachowicz, A Professional Law

Corporation.  The Law Offices of Mark R. Pachowicz, A Professional Law Corporation, represents Plaintiff Tyler H. Willis in the above-captioned case.  I am over the age of 18 and the following facts are of my own personal knowledge.  If called as a witness I could and would testify competently to them.

I.       MY EXPERIENCE AND BACKGROUND

2.  I received a Bachelor of Arts degree in Political Science from California State University at Northridge in 1985.  I graduated from the University of San Diego, School of Law in 1988, which is accredited by the American Bar Association.

3.  After passing the Bar examination in 1988, I started working for the Ventura County District Attorney's Office as a Deputy District Attorney.  I left that office for approximately one and a half years from 1993 to 1995 and practiced law with Nordman, Cormany, Hair and Compton.  It was, at the time, the largest law firm in Ventura County.  At the behest of the then District Attorney, Michael Bradbury, I returned to the Ventura County District Attorney's Office District in 1995.  I remained there until 2002.

4.  My prosecutorial career ended when I was sent to the child support division after Mr. Totten was elected as District Attorney.  Because the State of California had mandated child support matters be handled by any agency other than the District Attorney's Office, the County of Ventura created the Department of

Child Support Services, thus ending my prosecutorial career.

5.  When my prosecutorial career ended, I was a Senior Deputy District Attorney.

6.  During my tenure with the District Attorney's Office, I prosecuted all types of cases.  Like all prosecutors, I tried a number of driving under the influence cases and other misdemeanor crimes in front of a jury.

7.  Of special note, I successfully tried a number of different types of cases to a jury including:

A.   Vehicular manslaughter.  *People v. Halpin*, and *People v. Wysel*, both of which resulted in convictions;

B.   Animal cruelty.  *People v. Darrow Tully* which resulted in a conviction.  The defense attorney in that case was the now Honorable George Eskin of the Santa Barbara Superior Court;

C.   Sexual Assault.  Cases including *People v. Murray*, *People v. Warnken*, *People v. Ontiveros,* and *People v. DeLaTorre*.  Mr. Ontiveros and Mr. DeLaTorre were each sentenced to over 100 years;

D.   Domestic Violence.  *People v. Heath*.  Mr. Heath, who was convicted, was the Vice-President of the Ventura Chapter of the Hells Angels;

E.   I was one of two attorneys who worked on *People v. Brasure.* Mr. Brasure was sentenced to death after he was convicted of kidnapping, torturing, and murdering his victim.  His death sentence was upheld by the California Supreme Court in *People v. Brasure*, (2008) 42 Cal. 4th 1037; 175 P.3d 632.  I also prosecuted Mr. Brasure's codefendant, who was sentenced to 25 years to life; and

F.   I was also co-counsel in a Grand Jury Investigation which led to Indictments against a number of Hells Angels in what the former Ventura County District Attorney, Michael Bradbury, has called "undoubtedly the most, complex, lengthy, costly and significant investigation this County has ever witnessed."

8.  I worked for the Department of Child Support Services (DCSS) as a Senior Attorney until 2003.  I left DCSS and went to work as the Executive Director of SEIU Local 998.

9.   From 1998 to 2006, I was a Professor of Law at Ventura College of Law.  The courses I taught were: Legal Analysis (1999), Introduction to Law (1999-2003), Constitutional Criminal Procedure (2000-2003), Criminal Law and Procedure Selected Topics (2005) and Trial Practice II (2006).

10. I was voted, by the students, Professor of the Year at Ventura College

of Law for the years 2001-2002, 2002-2003, and 2005-2006.

11. At the end of 2004, I opened the Law Offices of Mark Pachowicz, A Professional Law Corporation.   Since that time, I have handled a variety of criminal and other assorted civil cases, including personal injury cases, employment cases, and of course, federal civil rights cases.  We have handled a number of matters which prove the skill set my office has developed.

12. In 2011, I tried *Velasquez v. County of Ventura* before a jury in Santa Barbara County.  Mr. Velasquez was a former Ventura County DAI senior investigator and the jury concluded he was retaliated against by the district attorney; for truthfully testifying in a discrimination matter.  The jury awarded Mr. Velasquez $1.3 million.  The County appealed and the Court of Appeal upheld the jury verdict and the lower court rulings in an unpublished opinion.

13. In 2012, I was voted the 2011 Ventura County Trial Lawyer of the Year by the Ventura County Trial Lawyers Association.

14. I was the lead trial counsel in *Senko v. City of Oxnard*.  Ms. Senko was injured due to a known defect in the stairs at a public venue owned by the City.  The City settled the matter for $1 million.

15. I was the lead trial counsel in *Huber v. County of Ventura.*  Ms. Huber was injured while in the custody of the Ventura County Sheriff's Department.  Her case was settled for $750,000.  In addition, the Sheriff's department has

implemented a number of new policies to address the lack of training and oversight which previously existed.

16. I handled *Morales v. City of Delano,* which settled as the jury was gathering downstairs, for $350,000.

17. A number of other civil rights cases I have worked on include *Hernandez v. The City of Santa Paula*, *McIntosh v. The County of Ventura* and *Fernandez v. The City of Oxnard.* Each settled prior to trial.

18. In total, I have tried over 50 cases to verdict before a jury.

19. At this point in my career, my clients are informed my hourly rate for all civil rights and civil trial litigation similar to this is seven hundred dollars ($700) per hour. This is based in part on the written opinion of Judge Dolly Gee in *Najera v. County of Los Angeles, et al*. Case Number CV-12-03167 and in part on the declarations of Carol Sobel and Barry Litt.

20. In the case of *Najera v. County of Los Angeles, et al*., which settled before trial, Judge Gee opined that a reasonable rate for work performed by me in 2012 was six hundred fifty dollars ($650) per hour.

II.   BILLING PRACTICES AT MY OFFICE

21. My firm bills in six minute increments and uses a billing system, Interbill, to track its time. The time spent on a case is recorded at or near the time the work is done. At the end of every month my attorneys and staff review their

billings in an attempt to make sure all entries are accurate and fair to the client.

22. The Law Offices of Mark Pachowicz, APLC, was comprised of me and two full time attorneys, Christina Stokholm and Kathleen Crouch.  I have another attorney who has been "of Counsel" who I will sometimes use to work on civil cases and I employ a paralegal full time, Charlene Thompson and another office employee who is not a certified paralegal, but who has worked in law offices for years and who routinely performs litigation support.  Ms. Stokholm left to open her own practice at the very end of 2013.

23.  My paralegal, Charlene Thompson, who performed a considerable amount of work on this case, obtained a Paralegal/Legal Assistant AA degree in 1996 and has approximately 17 years' experience.  She is billed at $200 per hour.

24.  The two other attorneys who work[ed] for my firm full time are Christina Stokholm and Kathleen Crouch.  Ms. Stokholm is a Senior Associate and has been with my firm since she graduated law school in 2006.  One of her bar examination essays was distributed by the California State Bar as an example of how to correctly respond to the question posed.  Clients are informed in this kind of case that Ms. Stokholm's hourly rate is three hundred seventy-five dollars ($375). Kathleen Crouch has been with my firm since she passed the bar in 2008.  Ms. Crouch has a background in technology which is outlined in detail in her declaration.  Because of her skill set, I have Ms. Crouch work with me on trials.

She is involved in preparing exhibits for display to a jury.  In the case of *Najera v. County of Los Angeles, et al.*, which settled before trial, Judge Gee opinioned that a reasonable rate for work performed by Ms. Crouch in 2012 was three hundred dollars $300 per hour.  Clients are informed that Ms. Crouch is billed at three hundred fifty dollars ($350) per hour for attorney work. However, Ms. Crouch also does trial presentation work for my office and for that I submit for the reasons stated below a rate of one hundred five dollars ($105) per hour is more than reasonable.

25. Both attorneys have worked for me since they graduated from law school.  Both were students at Ventura College of Law where I taught for years. Both were students of mine, whom I asked to clerk for me, and eventually hired as a result of their work product.

26.  On our invoice (Exhibit A) one can see another employee with the initials "MP."  This other person provides litigation support and is billed at $100 per hour. In this case she spent a significant amount of time going through all of the use of force reports and personnel files documents redacting information to insure we were in compliance with a court protective order.

27.  I am aware of other attorneys and firms who charge more for their time then I bill for attorney time and paralegal service for individuals of equal or lesser skill.  I am also aware that other firms have a service charge which is a percentage of that month's bill for work performed, to try to capture the non-billable

time the firm spends on matters.  Given the quality of work my staff puts out, I am of the opinion that the current rates charged by myself and my staff are reasonable, based upon the work I have done comparing the hourly rates of other attorneys who handle this kind of a case.  Given that we are a relatively small firm, the other attorneys and I attempt to expeditiously work on projects.  There is no incentive to work longer on a project than is necessary because, on cases like this, where we will not be paid if we lose, we would be wasting our time, money, and energy.

28.     I am confident the invoice (Interbill) submitted for work done by my staff and me (**Exhibit A**), does not include all of the work my staff and I performed on this case.  Interbill is the system we use to track our time and create invoices.

29.     I have 1459 emails in my inbox associated with this case. Approximately 245 of those are from the defense firm employees.  Approximately 29 are from the clerk of the court (this does not include the emails I automatically receive from the Court system "CM/ECF").  Obviously, there are many emails between my staff and myself, Ms. Mercado and myself, and Mr. Paz and myself.  As can be seen by reviewing my billing statement, very few are documented in my billings.

30.     I also know, based on the work ethic of me and my staff, we will spend more time on a project than we bill.  I believe the finished product represents my office and me, and while I may believe that extra time is required to produce a

product that is acceptable, to get it to that point may take longer than I believe I should charge for.  Therefore, I will often times reduce the time I spent on a project.  My staff agrees with this philosophy and follows my directive by doing the same thing.  I have no doubt that the total time listed on the attached invoice is less than the time actually spent working on this case.

31. I have worked with Ms. Mercado and Mr. Paz in the past.  I was approached by Ms. Mercado and asked if I wanted to get involved in this case and be the lead trial attorney on the matter.  When I became involved, I was informed by Ms. Mercado that the defendants had thus far refused to make an offer.  Once I was involved in this matter, I confirmed this fact with defense counsel.  Ms. Mercado had been working on the matter as a contingency fee case.  I agreed to work under the same terms she had with the client.  Taking on a case like this is a significant risk to my business for a number of reasons.  Given the verdicts to date under the terms of the agreement with the client, the attorneys will receive only what the court deems for us is a reasonable fee and the client will receive what the jury awarded to the client.

32.  The fees charged in this case are reasonable and the verdicts speak to the quality of the work.  In this case for example, I anticipated having approximately fifteen (15) to twenty (20) depositions and having to hire one (1) or more experts.  We would have to obtain, receive, and organize thousands of pages of discovery,

prepare for, and conduct a trial.

33.  Second, there is a significant risk to a firm the size of mine.  In this case for example, the defense had refused to make any offer, thus increasing the likelihood the case would go to trial.  Second, the client was an inmate at the time of the incident and had been in custody before.  The defense table, on the other hand, included seven (7) police officers in suits, whom jurors may be more likely to believe than other witnesses.  In addition, if only one person sides with the defense, we would lose the case.

34.  I, and others like me, however do take on such cases.  Having been a former prosecutor, I know what law enforcement officers should do and how they should conduct themselves.  I believe that justice requires the involvement of people like me, because it is obvious, especially in a case like this one, the police refuse to competently police themselves.  Sometimes, as was the case here, the only way for the Constitution to remain a viable thriving document is for attorneys, like me, to seek to enforce the Constitution, when those elected or charged with enforcing it - refuse to do so.

35. I know a jury may not award large sums of money to a person who was an inmate at the time of the incident.  Therefore, I would not receive reasonable compensation for the time and money I spend on an important case, without the ability to seek costs and fees, if the plaintiff is considered the prevailing party.

Therefore, a factor in my decision to get involved in a case like this, is the fact that if the plaintiff is successful, certain costs I incur will be paid by the defendants and my expenditure of time will be compensated by the defendants; who caused this matter in the first place and perpetuated the continuance of the matter by refusing to make one settlement offer.  It is important in my decision, as Congress understood it would be, when they passed 42 U.S.C.S. §1988; that I have the right to ask the court to require a defendant, who violated the Constitutional rights of an individual, to pay reasonable attorneys' fees and costs.

36.  As an attorney who handles a number of civil rights matters, I can attest through firsthand knowledge that such cases are frequently considered some of the toughest, if not the toughest, of all cases.

37.  One of the main reasons I began to emphasize civil rights cases in my practice, was that it became apparent to me, that there was a shortage of competent plaintiff's counsels willing to accept such cases, especially in Ventura County, where my office is located.

38.  Contingent cases present the very real risk of working hundreds of hours which may never be entirely compensated - or compensated at all for that matter.  The prospect of loss is, unfortunately, real.

39.  Further, in addition to the potential of an outright loss, even "victories" in contingent fee cases can present economic difficulties to smaller law

offices.  While the case is being litigated, counsel must pay overhead, provide for their own expenses, and in most cases, pay the out-of-pocket expenses incurred on the plaintiff's behalf.  The costs of a case like this one through verdict, can run into the tens of thousands of dollars to hundreds of thousands of dollars.  If you do not prevail, then you have personally lost the money you invested into the case for litigation costs.  And, in some contingent matters, the length of the case itself, presents economic difficulty to the small practitioner, who is not adequately compensated by an eventual award of fees based solely on the lodestar methodology without a multiplier.  For example, if a case is disposed of by summary judgment, and then reversed on appeal, later to be tried to verdict, the eventual award of fees without a multiplier does not compensate for the delay in payment.  And, during that delay, overhead and costs of litigation continue, even though no compensation is forthcoming.   In this case, right after the verdict, the defendants were publicly commenting that the jury was wrong and they were going to appeal.   Thus, guarantying the delay of any payment for the work that has been done on this case, for perhaps years.

40. The prospect of a court-awarded fee does not greatly reduce the risk posed by these cases.  In many cases, the prospect is nothing more than a potential that never materializes.  First, you must win the case to get a court-awarded fee; even those cases that seem strongest at the outset can be lost, and sometimes are

lost.  Second, there are always pitfalls and unforeseen obstacles which arise along the way; such as settlement offers the client may accept without ensuring that counsel receives a reasonable fee, or changes in the law which substantially affect the merits of the case, or other uncertainties involving the client.

III.    THE PLAINTIFF WAS THE PREVAILING PARTY

41.  In this case the plaintiff in *pro se* filed a Tort Claim with the County of Los Angeles on February 4, 2010.  In the claim he outlined the excessive use of force which was used against him.  The county rejected the Tort claim, and his request for a settlement.

42.  Prior to my firm getting involved, Ms. Mercado attempted to settle the matter (See Decl. of Sonia M. Mercado).   After I became involved, I had conversations at various points in time with counsel for defendants, Mr. Hurrell, but he never made an offer.  The defendant had the ability to make an offer pursuant to U.S.C.S. Fed. Rules Civ. Proc. R. 68, but they did not.  Even after raising the possibility of a resolution of the matter with the trial court at the settlement conference right before trial, defense counsel was unable to make ANY offer to plaintiff.  The defendants are thus entirely responsible for the costs and fees incurred by proceeding to trial.

43. As the court is well aware, plaintiff was overwhelmingly the prevailing party.  When this is added to the fact that the defendants' refused to make

any offer to plaintiff, there is no doubt the defendants are responsible for the fees and costs expended by plaintiff's counsels.

## IV.   THIS WAS A COMPLEX CIVIL RIGHTS CASE

44.   This was not a simple garden variety use of force case.  Defendants Vazquez, Farino, and Guerrero used excessive force on the plaintiff causing a fractured bone in his face and a broken tibia.

45.   Defendants Sanchez, McDaniel, Aguilar, and Cruz did nothing to properly investigate the matter and in fact, did things to cover up the use of excessive force.

46.   Defendants Aguilar, Cruz, and Baca all had the responsibility of supervising the people below them, and making sure they did their jobs.  That responsibility included making sure the deputies were properly trained, properly supervised, and properly held accountable for any inappropriate conduct.

47.   The County and the Los Angeles County Sheriff's Department were defendants because of the policy and practice they had engaged in over the years.  In order to prove this case, counsel had to become well versed in the history of abuse which has taken place at LASD.  Counsel had to know what the defendants should have known and did in fact know over the years leading up to the incident before the court.  This meant understanding and knowing the Citizens Commission on Jail Violence report, reports by the Special Counsel, and reports by the Office of

Independent Review, as well as reports by the ACLU.  A decent amount of time was spent by counsel, reading these various Internet articles, and watching various Internet videos about the Sheriff's department, including press conferences by Sheriff Baca (which was not billed because it went to counsels' general knowledge in handling not just this case, but all cases against the Sheriff's department).

48.  This case was actually three civil rights trials in one, against a total of 10 defendants.  This was a complex civil rights case.

V.    MY RESPONSIBILITIES AS LEAD TRIAL ATTORNEY

49.  I was brought into this case to act as lead trial counsel during the trial. My responsibility was to envision the trial and to prove the allegations in the Complaint to the point where, unanimously, the jury would find the allegations were true; and then to compensate the plaintiff for the harms and losses he sustained.  In order to fulfill my obligation to the client, I had to review the discovery already obtained.  I had to obtain additional discovery through depositions and documentary forms.  Then, I had to put all the pieces together in such a way that would allow the jury to see the truth of the plaintiff's allegations.   In order to fulfill my responsibility, I had to know all the facts and the law and insure that the ship we were sailing was headed on the correct course.  This meant I needed to review the reports and discovery myself.  It meant I needed to conduct the depositions myself. It also meant I needed to review the depositions myself before trial for three

significant reasons.

50. First, something the deponent said in the first deposition (which seemed to only have some importance at the time), could have a huge impact, after hearing what the other defendants said during their depositions.  Perhaps the greatest example of this was when Deputy Vazquez commented about a deputy in the cage.  While it was important when Deputy Vazquez said it (and we conducted a deposition of the person who should have been in the cage), given Sgt. McDaniel's assertion there were no witnesses, and no report by a deputy witness, Deputy Vazquez' statement that he was next to the guy in the cage proved to be of great value to plaintiff's case.

51. Second, I reviewed the depositions with an eye toward the trial.  What provisions will we have ready to use as a video clip or to read from the transcript? Some selections would be used in the case-in-chief and others would be ready for rebuttal.  In this regard, knowing the facts is the most valuable tool a trial attorney can have when going to trial; which is why I do not have others summarize deposition transcripts for me.

52. Third, the deposition reviews are used to create questions and answers I anticipate presenting to the jury; which will ultimately be the facts necessary for the jury to reach the verdict we seek.

53. Below is a table showing the length of the depositions conducted

based upon the video times.

| Deposition Time Tracker Table | | | | |
|---|---|---|---|---|
| Deponent | Transcript Pages | Start Time | End Time | Total Time |
| Aguilar | 257 | 10:05 | 17:47 | 7:42 |
| Bryce | 195 | 10:00 | 17:28 | 7:28 |
| Chavez | 71 | 9:36 | 10:50 | 1:14 |
| Cruz | 275 | 9:34 | 18:51 | 9:17 |
| Farino | 215 | 9:20 | 15:27 | 6:07 |
| Gasko | 75 | 9:02 | 10:52 | 1:50 |
| Grogan | 45 | 16:57 | 17:50 | 0:53 |
| Guerrero | 236 | 9:08 | 16:22 | 7:14 |
| McCorkle | 232 | 9:14 | 16:24 | 7:10 |
| McDaniel | 248 | 10:04 | 16:37 | 6:33 |
| Nuesca | 60 | 9:15 | 10:36 | 1:21 |
| Renfrow | 92 | 13:22 | 15:47 | 2:25 |
| Sanchez | 142 | 12:07 | 15:29 | 3:22 |
| Valencia | 117 | 9:08 | 12:12 | 3:04 |
| Vazquez (Vol. 1) | 241 | 10:00 | 16:16 | 6:16 |
| Vazquez (Vol. 2) | 45 | 14:17 | 15:30 | 1:13 |
| Wellendorf | 233 | 9:59 | 17:00 | 7:01 |

## VI.   THE DEFENDANTS' ARE RESPONSIBLE FOR MY TRAVEL TIME

54.  Initially, I noticed depositions to be taken in my office in Camarillo, California.   Defense counsel desired to conduct the depositions in Los Angeles because it was more convenient for defense counsel, the defendants, and witnesses.

Each minute of travel time I incurred to attend depositions in Los Angeles, saved the defendants from: (1) paying their attorneys to travel; (2) paying the defendants overtime; (3) paying their witnesses for overtime travel; and (4) preventing them from returning to work later, thus saving further additional monies for paying a replacement employee. For two depositions, I drove to the Sheriff's station where a deponent was assigned to conduct the depositions. The rest of the depositions we noticed were conducted in Culver City. I did this because the defense was making it difficult to take the depositions of some of the officers. It became so difficult in fact, that we had to involve the magistrate to compel some of the depositions.

55. Now that the plaintiff is the prevailing party, the defense is obligated to pay the travel time I incurred, at their request.

56. In order to reduce the expense of conducting depositions, we set several depositions for consecutive days in Los Angeles; and I would travel to Los Angeles and stay there overnight, because it was less expensive and more productive to spend the night in a hotel room than to incur travel costs.

57. I consulted the MapQuest website to determine the distances I traveled in this case. I believe the MapQuest estimates of the distances to be accurate based upon actually traveling the distances. Given Los Angeles County traffic, the time it actually takes to travel the distances is inaccurate. For some of the Los Angeles County appearances, it was more cost-efficient and productive for

me to drive to Los Angeles County late in the evening the night before an event and spend the night, rather than drive to Los Angeles County from Ventura County during morning rush-hour traffic.  In addition, to keep costs down, (it is my money that I am advancing after all) I specifically chose cost-efficient accommodations, rather than expensive hotels.

## VII.   PREPARATION IS THE KEY

58.  I have made it an essential part of my practice to consistently prepare for depositions with an eye toward trial.  This preparation includes anticipating all exhibits which will be utilized for a number of deponents and eventually at trial, so there will be consistency in the exhibit numbers from one deposition to another. This practice also creates a consistency between the exhibits referenced in a video clip or transcript and the exhibit number used at trial.  I believe this preparation time is well spent on the front end on a case and is recognized at trial because there is no confusion between multiple "Exhibit Number 1's, etc." and things move smoother in front of the jury; which they did in this case.

59.  As lead trial counsel my goal is to insure the evidence in support of the case is admissible and the evidence in opposition to the case be deemed inadmissible.  In addition, in my role as trial counsel, I was required to insure the theme of the case was consistently presented in all pleadings.  Because I was the person who was most familiar with the facts of the case, it was imperative for me to

insure the factual representations made in the pleadings were correct.

60.  As a result, I spent a significant amount of time preparing a document which would eventually become the factual basis of the Contentions of Fact and Law as well as the other motions, including the Motions in Limine.

61.  Lead trial counsel for the defense was not involved in the meet and confer discussions we had on the Motions in Limine.  It is my belief that had Mr. Hurrell been more involved in the meet and confer aspects of the case, the discussions would have been more fruitful and perhaps would have eliminated the need to file some of the motions.  As it was, we filed eleven Pretrial Motions in Limine and the court ruled in our favor on most of them.  In essence, we were partially successful we withdrew one based upon a change of circumstances.  Of the ten Motions in Limine filed by the defendants, the court ruled in our favor on three of them and we were partially successful on two other ones.  In fact, after our pleadings, the defendants conceded on several of the motions.

VIII. HOW WE USE AND BILL FOR TIME SPENT ON TRIAL PRESENTATION

62.  I have conducted jury trials for 25 years and began my career using butcher paper to make my charts on poster board exhibits.  Times have changed and the use of technology is essential and expected by jurors.  In fact, it makes trials run smoother and faster when performed correctly.  Several years ago, I met a man who

operates his own videography business.  His company videotapes depositions, creates trial exhibits, and creates an exhibit data base from video clips.  After learning of the costs associated with his videography business, I pondered whether there was a more efficient and cost effective way to conduct trials and insure the work product met with my specifications, rather than his.  I reviewed various software programs available such as "Sanctions" and "Trial Director."  Thereafter, I purchased the software program "Trial Director" and encouraged Ms. Crouch to learn how to use it.  In addition, I purchased an enhanced computer capable of handling the program, and the evidence we collected, and intended to use.  Given the skill set of my staff, it is more efficient and cost effective to have my staff organize the evidence in a case into the Trial Director software program.  This way, if a case does not settle and goes to trial, the evidence is already in the Trial Director software program.  The benefit of my staff inputting the information is they become familiar with the case and the evidence.  I have an attorney, Kathleen Crouch, who is very well versed in technology, and is a great assistant at trial.  When she syncs the videotaped depositions and transcripts and creates the video clips, she becomes familiar with the evidence.  Therefore, when she is needed to do legal work there is no time wasted familiarizing her with the evidence in the case.  She is also able to evaluate the evidence she is inputting into Trial Director through the eyes of an attorney.  In addition, when travelling is necessary in a case, an attorney is at my

disposal to perform legal work as needed, during the trial.

63.  I realize a non-attorney outside contractor can do this type of work as well and if I did that the charge may be a "cost" rather than a "fee." Prior to choosing an in house worker or a contractor I compared the two alternatives.

64.  I surveyed four different companies and their charges for this type of work.

65.  Telegenics charges one hundred seventy five dollars ($175) per hour for database management.  They charge a flat rate of eight hundred fifty dollars ($850) per day for trial work.  In addition, they charge a fee if you use their audio and video equipment.

66.  Trial Media Solutions is located in Los Angeles.  They charge one hundred seventy five dollars ($175) per hour, but they do not charge a daily trial rate.

67.  AL2 Consulting charges one hundred ninety five dollars ($195) per hour.  They have a ten (10) hour minimum for trial work for so their daily trial rate is nineteen hundred fifty dollars ($1950).  We contacted them and have received the price schedule from them.

68.  Litigation Technology in Los Angeles charges one hundred ninety five dollars ($195) per hour.

69.  I feel it is inappropriate and unreasonable to seek Ms. Crouch's

attorney rate for this type of work. Her rate for this type of work is more than reasonable at one hundred five dollars ($105) per hour and below what a contract worker would be for this type of work. In contrast, her attorney rate, for working on jury instructions, pleadings, and the like, is three hundred fifty dollars ($350) per hour.

70.  In my view, the extensive work we did in this area was the reason we were able to significantly cut the anticipated length of the trial and live within the court imposed time guidelines.

IX.   COSTS OF NOTE

71.  Attached to this motion is evidence of the costs which we have incurred while handling this case and are seeking reimbursement. The Court should know that my office has a copy machine which requires the user to enter a file number.  The machine tracks the numbers of copies made for each case on a monthly basis.  My office pays for the machine and for the maintenance, including the drum and toner cartridges.

72.  We log the faxes we send by hand and those documents are collected each month and added to the billing statement of the appropriate case.

73.  Attached are invoices from Hayes Graphics.  I have a contract with this local print business to insure they do not reveal any privileged information. They printed color copies of the photographs which were used during the

1   depositions and trial.

2       74.  There are invoices from FedEx / Kinkos for the large trial exhibits

3   which were shown to the jury of the Plaintiff's broken leg and a diagram of the area

4   at issue.

5       75.  Several months prior to trial, I became aware of a civil rights case

6   where the court precluded a plaintiff from introducing a witness' statement (who

7   had become unavailable despite being served with a trial subpoena at his

8   deposition), because the witness had not received his witness fee at the same time.

9   Therefore, I sought to have all witnesses served by a private investigator and

10  provided a check for fees based upon their location.  I sought defense counsels

11  assistance in insuring the attendance of all the County employed witnesses.  In fact,

12  I provided defense counsel a copy of every subpoena I was trying to serve

13  and asked that they contact all the County employees.  I was informed they could

14  make no guarantees with regard to the hospital employees (even though they worked

15  for the County), and might not even be able to help with the retired deputies.

16  Therefore, I sought to serve all of the witnesses I believed were necessary to try the

17  case.  In one instance, a Sgt. informed my investigator he would not accept service

18  of a subpoena because the check was made payable to the individual; and he

19  demanded the check be made out to the County.  My investigator had to go back out

20  and serve the department.   Further, the department would not just accept the

21
22
23
24
25
26
27
28

DECLARATION OF MARK R. PACHOWICZ IN SUPPORT OF     CASE NO. CV 10-7390 JAK (DTBx)
PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
25

subpoenas in one location.  My investigator was required to go to the employment location of each deputy to perfect service according to the department.

76.  The Court may recall that a person named Edgar Bringas was in cell A-6.  I sought to have this person located and interviewed.  My investigator located him in the California Prison System.  The investigator learned about his underlying case and the fact that it involved his nephew (which corroborated a statement my client had made years before), thus solidifying my client's credibility.  Had the defendants been permitted to introduce evidence about the nature of Mr. Willis' pending charges, this evidence would have been necessary and admissible.  In addition, I had the investigator attempt to locate another inmate who witnessed a vicious beating within days of this case.  Despite our best efforts, we were unable to get him to respond to our inquiries.

X.    REQUESTED ORDERS

77. I am requesting that the court find the plaintiff to be the prevailing party. Further, that the defendant chose not to make any offer and to litigate this case in the way they did and are therefore now responsible for the fees incurred by plaintiff's counsel.

78. Based upon the material before this court I am requesting the court find as reasonable the following rates for my staff and myself:

| | |
|---|---|
| Mark Pachowicz | $700 per hour |
| Kathleen Crouch – Legal work | $350 per hour |
| Kathleen Crouch – Tech | $105 per hour |
| Charlene Thompson – Paralegal | $200 per hour |
| Mercy Perkins – Litigation support | $100 per hour |

79. Further, that the hours of work performed, as described in Exhibit A, by the Law Offices of Mark Pachowicz, APLC, are reasonable and necessary.  Thus, I am requesting an order for fees in the amount $622,101.50.

80. Finally, I am requesting $22,348.72 in costs.


I declare under penalty of perjury, under the laws of the State of California, the foregoing is true and correct.  This Declaration is executed at Camarillo, California.

Dated: February 24, 2014                    /S/ Mark R. Pachowicz
                                             Mark R. Pachowicz