Sonia M. Mercado (SBN: 117069)
**SONIA MERCADO & ASSOCIATES**
5711 W. Slauson Avenue, Suite 100
Culver City, California 90230
Telephone: 310.410.2981   Facsimile: 310.410.2957
soniamer2002@yahoo.com

Mark Pachowicz (SBN 138108)
**LAW OFFICES OF MARK PACHOWICZ**
**A Professional Corporation**
771 E. Daily Drive, Suite 230
Camarillo, CA 93010
805-987-4975
Mark@Pachowicz.com

Co-counsels for Plaintiff Tyler Willis

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYLER WILLIS, | CASE NO. 2:10-cv-7390 JAK (DTBx) |
| Plaintiff, | [Judge John A. Kronstadt, Courtroom "750"] |
| v. | **DECLARATION OF SONIA M. MERCADO IN SUPPORT OF REQUEST FOR ATTORNEY FEES AND COSTS**. |
| ANTHONY D. VASQUEZ, MARK V. FARINO, PEDRO L. GUERRERO, LIEUTENANT XAVIER AGUILAR, CAPTAIN DANIEL CRUZ, SHERIFF LEROY BACA, LOS ANGELES COUNTY AND LOS ANGELES COUNTY SHERIFF DEPARTMENT, | Date: April 21, 2014 Time: 8:30 a.m. CtRoom: 760, Roybal, Judge John A. Kronstadt |
| Defendants. | |

I, Sonia M. Mercado, am an attorney duly licensed to practice law in the State of California and before the United States Central District Court in Los Angeles, before the Ninth Circuit Court of Appeals and before the United States Supreme Court.   I am co-counsel for Plaintiff Tyler Willis.   If called as a witness in this matter, I would competently testify as follows:

1. I submit this declaration in support of my request for attorney fees and out of pocket costs pursuant the Special Verdict Judgment entered November 6, 2013, Docket No. 455.   I billed 708.8 hours, at an hourly rate of $770.00 for a total of $545,890.00 attorney fees, $11,424.00 paralegal fees and $57,813.93 in actual out of pocket costs.   Attached as Exhibit 15, is a correct copy of my hourly billing Timeslips Fee Statement, as Exhibit 16, the Cost Bill incurred during this litigation, and as Exhibit 17 my paralegals billing Timeslip Statement.

2. Based on this declaration, the declaration of attorneys Carol Sobel (and her Exhibits 1 through 12 thereto), and Barrett Litt (and his Exhibits 13 et seq.), both who are experts in determining the reasonable billable rate for an attorney such as myself practicing my specialty in Los Angeles, I submit that my hourly rate of $770.00 and the number of hours billed in this case is reasonable.

3. In an effort to avoid filing this motion and to resolve the attorney fees and costs issues, on February 19, 2013, prior to filing this motion, I contacted Mr. Thomas Hurrell and forwarded my costs itemization and tried to resolve this matter.   On February 22, 2014, Mr. Hurrell informed me that we would not be able to resolve the fees and costs issues, thus this motion is necessary.

**Background to this litigation necessitating the work performed.**

4. I began working on the *Willis v. Vazquez* on July 2, 2012, when Mr. Tyler Willis retained me to represent him.   He had been representing himself in pro per since October 4, 2010, while he was in custody, and informed me that he had not been able to find an attorney to take his case and that the defense had been obstructing his discovery efforts. When he first retained me on July 2, 2012, he was homeless and he had an impending opposition to a motion to dismiss due within 7 days on July 9, 2012. After reviewing some of his documents, his allegations of physical abuse appeared factually and legally meritorious.   I opined that if I did not help him, he would lose on the motion and his case would be dismissed.

5.    Defendant Vazquez's motion to dismiss alleged that Mr. Willis had failed to comply with PRLA requirements of filing a complaint against the officers immediately following the use of force incident, thus he was precluded from filing a lawsuit. I was struck by the query, that if this were true, why had defendants not merely responded to the Complaint with a 12b(6) motion to dismiss in the first instance.

6.    Because the litigation had been ongoing for the period of 1.8 years and Mr. Willis had little discovery, I had to shift gears and cram getting up to speed on the factual and legal merits of the case in a few days including working through the holiday.   I was required to drop everything in order to come up to speed on the limited available facts, research the issue of fact and law, as defense counsel refused even a simple courtesy continuance.   I had to do factual and legal research on very short notice to overcome the misstatements of facts in the PRLA motion (filed May 3, 2012, Docket 100) which effected an order for further briefing (see docket 136)[1], caused a lengthy 6-month process (see Docket 100 to Docket 154), consuming not just an inordinate amount of my time, but equally absorbing judicial time and effort before we finally prevailed in opposing the motion.   (See orders Docket 151 and 154).

7.    On July 6, 2012, when I substituted into the action, and a second time on July 9, 2012, when the opposition was due filed, I requested a courtesy continuance from defense counsel which was denied both times.   Although Mr. Paz was at the thrust of "retirement" he agreed to help me on this matter, but would not to be named in the pleadings as he wanted to pursue retirement instead.   However, he was particularly vital to the efficient prosecution of this case.   As an example of our efforts at efficiency and division of legal tasks, due to Mr. Paz's knowledge of the legal civil rights issues he would assist on the issues of

---

[1] The defense alleged that Plaintiff had filed "an appeal," Plaintiff responded this was untrue and despite further briefing so the defense could submit this evidence, no such appeal existed and none was produced.   (Docket 136 and 151 Report and Recommendation.)

supervisor liability and *Monell* claim he worked on those issues and I continued working on all aspects of evidence gathering, discovery matters, joint stipulations, mediation briefs and law and motion matters.

8.   Due to misstatements of facts in the PRLA motion (for example, that Plaintiff had filed an appeal, ergo he had notice of PRLA compliance), and to the very little discovery Plaintiff had obtained to that date, it was particularly time consuming to oppose the motion as I had to research facts outside the case regarding LASD PRLA compliance requirements and lack thereof.

9.   In preparing the Fourth Amended Complaint (FAC), I was particularly cognizant that in naming Sheriff Baca in his individual capacity as a supervisor in the claim for "Failure to Train, Supervise, Causing Constitutional Violation," it was critical to first gather substantial evidence and data to include in the complaint in order to avoid defense filing a motion to dismiss Sheriff Baca for failure to state a claim.   The same was true of Capt. Cruz.   Ensuring that we had substantial evidence at the outset on the supervisor liability issues and *Monell* claim would be the most efficient way to prosecute the case and help avoid further Rule 12b(6) motions, potential appeals and motions for summary judgment.   We in fact averted such proceedings.

10.   On or about February 2012, as defendants were aggressively litigating the case, it became obvious to me that I would need further assistance going forward in doing depositions and in anticipation of trial.   I associated Mr. Pachowicz, with whom I had worked on a prior jail matters, because of his commitment to civil rights, his skills in depositions and his trial skills as a prosecutor and civil rights advocate.   He graciously agreed to work on this matter and we jointly agreed on how to divide the upcoming pretrial litigation.

11.   As our respective Timeslips billing statement reflect, I continued working the legal issues of the case with the help of Mr. Paz regarding supervisor liability and proving a custom and practice *Monell* claim.   Mr. Pachowicz focused on depositions and trial presentation.   Although Mr. Pachowicz took the

depositions, I attended all depositions to assist with factual background information as well as legal issues.   He and I conferred during the depositions on factual and issues of law.   Although I did not bill for the depositions of the deputies, I opine that my assistance during the deposition of the supervisor defendants and witnesses on supervisory issues was vital on the Supervisor Liability and *Monell* theories of the case as I was preparing those for trial, and I have billed for the supervisor depositions.   I continued working on substantial discovery matters, law and motion, attempts at resolution, client contacts, and was generally coordinating all legal and factual aspects of the case.

**All Settlement Efforts Were Rebuffed.**

12. Defendants rebuffed all settlement offers made by Plaintiff and ignored the Court's admonishment that the parties participate in settlement discussions.

   a. <u>First Offer – Feb 3, 2010</u>: Mr. Willis served his Government Claim on * and the claim was sent to medical review which had nothing to do with his claim (somebody made that decision);

   b. <u>Second Offer – Jun 12, 2012</u>:   Plaintiff wrote defendants' counsel offering to settle this matter for $200,000 so that he would not have to hire an attorney to represent him.

   c. <u>Third Offer – Aug 8, 2012</u>:   shortly after I was hired and filed an opposition to the motion to dismiss, defense counsel Ms. Martinelli asked me to serve a settlement demand.   I sent a written demand explaining the factual and legal merits of the case, proposing a $475,000 settlement inclusive of attorney fees and costs.   There was never a response.

   d. <u>Fourth Offer – Jan 8, 2013</u>:   at Rule 26(f) scheduling conference Mr. Hurrell represented to the court the parties would attend an early mediation with the Magistrate.   The Court issued an order to attend mediation with Magistrate Bristow, and Magistrate Bristow scheduled the requested early settlement conference for January 22, 2012.   Pursuant to his Order, I sent defendants an

offer of settlement on January 8, 2013.   Defendants responded that they would not participate in settlement and that they had no authority.

e. <u>Fifth Offer – Feb 22, 2013</u>:   I telephoned and directly spoke with the county counsel in charge of this case (who had previously advised me that I could call her directly) and offered to settle the case for ½ of the prior demand of $475,000 offer, and that I would forego my attorney fee to settle the case.   I never received a response to this offer.

f. <u>Sixth Offer – May 15, 2013</u>:   I served another demand because Defendants had agreed to participate in mediation with Magistrate Bristow on May 25, 2013.   Upon arriving for the conference before Judge Bristow, defense counsel advised that he thought settlement discussions were premature and that he wanted to propound further discovery.   Again Defendants ignored Plaintiff's demand.   Subsequent to this conference, both Mr. Pachowicz and I made informal inquiries into resolution to no avail.

g. <u>Seven – Sept 9, 2013</u>: at the Pretrial Conference the Court admonished all the parties to discuss settlement, and even offered to assist in the matter.   Defense counsel advised me that they had no authority.

**Reasonable Attorney Fees.**

13.   My request for an hourly billing rate of $770.00 is based on my education, professional expertise and experience as set forth below. This fee amount is also based upon expert opinions of Carol Sobel and Barry Litt, who are experts in the area of attorney fee rates in the Los Angeles legal community and for civil rights specialists.   Such an hourly rate is consistent with those attorneys of comparable experience practicing complex civil rights litigation, comparable expertise and skill in the Los Angeles legal community and demonstrates that my hourly rate of $770.00 is at or below market rate.

14.   My paralegal, Angelica Ochoa is a UCLA law graduate waiting for bar results and admission to the bar.   In determining her hourly billable rate, I rely upon my own research from colleagues in the community, including colleagues in

large law firms, and upon the expertise of Ms. Sobel and Mr. Litt.   Based on this information and data, I bill my paralegal at the rate of $200 per hour, which is the general standard in Los Angeles.

**Educational and Professional Background.**

15.   I graduated from Atlantic Union College, South Lancaster, Massachusetts in 1971 with a B.A. in French and a minor in Education; I attended Séminaire Adventiste du Salève, Collonges-Sous-Salève, France as part of my B.A. program from September 1968 to December 1969; I attended U.C.L.A. Department of French, Los Angeles, California and received a M.A. 1976, in French Literature; I attended Université de Strasbourg, Strasbourg, France (Master preparation) in 1978; I was a Ph.D. candidate at U.C.L.A. in French Literature, during 1977-79, when I changed career paths.

16.   In 1980 I attended U.C.L.A. School of Law and graduated in 1983 graduate, Los Angeles, California, and was admitted to the bar in 1984.

17.   Prior to starting my own law firm in1991, I worked for two law firms: first at Pollack, Lintz & Williams, practicing medical malpractice litigation (1985-1987); and then Cummins & White, practicing civil litigation in the areas of business, medical malpractice defense and insurance defense (1987-1991).   I subsequently opened my own law firm in 1991, initially practicing in the areas of medical malpractice, securities fraud, civil rights and appeals before the 9th Circuit Court of Appeals and State Courts of Appeal.   Since 1994, my practice focused only in constitutional law, with a particular emphasis on the civil rights of persons in custody to medical and mental health care and to reasonable security.

**Professional Organizations and Volunteer Work.**

18.   I am a member of numerous professional associations such as the Mexican American Bar Association, the Latina Lawyers' Bar Association, the National Police Accountability Project.   I was a Member of the Executive Committee of

the Litigation Section, California State Bar, 1998 to 2001, and I continue to participate with other lawyer associations.

19. On my personal time I do substantial volunteer work in the area of education of mentally and/or educationally disabled youth.   I am a Member of the Board of Directors, Los Angeles Child Guidance Clinic, 2001- present, a non-profit clinic and school providing free special education and mental health services to indigent students and parents in South Central Los Angeles area; I was a founding board member of "Learning Rights Project" and was a Member of the Board of Director's until 2011, and continue being involved.   Learning Rights is a non-profit organization providing free legal information and representation to indigent children with learning disabilities.   This project was previously part of the Western Law Center for Disabilities Rights located at Loyola Law School.   Learning Rights works with U.C.L.A. School of Law to train young law students and lawyers on the educational rights of children with disabilities.

20. From 2005 to 2011, I was a Member of the Board of Trustees of Vistamar School prior to its opening for class.   Vistamar is a non-profit 9-12 grade high school whose mission is to ensure diversity of thought and culture by enforcing a policy of a student body comprised of social, economic and racial diversity in order to foster authentic exchanges of a balanced world perspective.

21. I have also volunteered as a Member of the Oversight Committee for Measure K Bond, Inglewood School District, Inglewood, CA., 1998 to 2004 with responsibility for oversight of expenditures of $131 million school district bond. I previously volunteered on the Board of Director Member, Marcellus Wiley Youth Program, Los Angeles, CA, 2002, assisting disadvantaged youth to obtain educational and other needs for success in life; and, I Participated in the

Ceasar Chavez Scholarship Foundation, U.C.L.A., Law School (offering summer stipends to law students interested in public interest law), 1998-2004.

**Awards, Recognitions and Scholarships.**

22.    I am the recipient of various awards and recognitions: In October 2013, I received a commendation from the County of Los Angeles, Chairman of the Board, Supervisor Mark Ridley-Thomas for my contributions to the benefit of all the citizens of Los Angeles County; on the same month I received the City of Los Angeles Certificate of Recognition from Councilmember Gilbert Cedillo for my achievement in being awarded the "Culture of Liberation Award."   In June 2007, I was awarded the National Lawyers Guild's Robert Kenny Award, L.A. Chapter for my contributions to civil rights.   That same year I received a Certificate of Recognition from the California Senate, Majority Leader Gloria Romero, for my commitment and dedication to our community.   In June 2006, I was selected by the *Daily Journal* as one of California's top 75 women litigators for my work in civil rights litigation; in December 1, 2000, the *Daily Journal*, published my "Litigator Profile" regarding a seminal case wherein Mr. Samuel Paz and I successfully obtained an injunction preventing the Ventura County Sheriff's Department from the unconstitutional practice of restraining inmates while naked in a four point restraint chair.   (*Von Colln*, 189 F.R.D. 583, infra.); I was honored for my volunteer work at the Westside Legal Services and received the California Bar Association Board of Governor's Award for Contribution to Pro Bono Work, 1985.

23.    While at U.C.L.A. School of Law I was the recipient of the Beverly Hills Bar Association Scholarship (1981-1983), and of the Western State Scholarship (1980-1981); as a graduate student in French.   I received a Graduate Program Fellowship, 1977-1978.

**Samples of Related Successful Civil Rights Cases.**

24. I have successfully represented clients in cases regarding issues of deliberate indifference to inmate/detainee mental health and/or medical care in jails; excessive use of force; enjoined the inhuman use of restraint chairs in jails causing physical injury, obtained a consent decree and subsequently participated with defendants in drafting policies and procedures for the use of restraint chairs in custody.   The following are samples of some cases throughout the State of California and the vindicated constitutional rights at issue:

a. *Gavira v. County of Los Angeles,* Los Angeles Sup. Ct. Case No. BC295053, was an early case giving Sheriff Baca and LASD high ranking officials notice of endemic jail violence and deputy use of excessive force at MCJ.   Mr. Gavira's survivors sued LASD and individual deputies for failure to provide reasonable security resulting in Mr. Gavira's death; supervisor's failed to take corrective measures to hold their subordinates accountable, including a female deputy who used excessive force and harassed Mr. Gavira.

b. *S.D.C v. Sheriff Lee Baca*, C.D. Cal. Case No. CV05-8807 CAS (SSx) c/w *Moye v. Sheriff Lee Baca*, Case No. CV06-1569, arose from the abandonment of posts by jail guards thereby enabling Hispanic gang inmates to beat to death Mr. Cochran, a mentally disabled pretrial detainee.   Supervisor defendants failed to take corrective measures to prevent subordinates' misconduct.

c. *Madera, Gonzalez, et al v. Ventura County, et al,* U.S.D.C. Case No. CV 97-01859 CM, Plaintiff prevailed against a private corporation providing medical care at Ventura county jail who argued that it could only be sued for medical negligence and not for constitutional violations of deliberate indifference to the inmate because it was a "private" non government agent.   Plaintiff established that the company was an agent of the county

and thus could be held liable for its medical staff's constitutional violations and deliberate indifference to inmate health care.

d.  *McNamara v. County of Los Angeles*, Los Angeles Sup. Ct. Case No. BC 362264, arose from the abandonment of the post by jail guards who failed to provide reasonable security to a pre-trial detainee resulting in other inmates severely injuring plaintiff.  No deputy who abandoned his observation station was questioned by supervisors regarding the reason for their misconduct.

e.  *Whitfield v. State of California Youth Authority*, Case No. E.D. Cal. Civ S-04-2729, and related case *Feaster v State of California*, Case No. E.D. Cal. Civ S-04-2730, a substantial award in an dual actions regarding the failure of CYA officials to provide mental health care and reasonable supervision to two mentally disable juvenile teenagers held at CYA Ione facility in Northern California.  The case exposed this ongoing practice in other juvenile facilities in the state, and the failure to take corrective measures.

f.  *Mendoza v. County of Los Angeles*, (L.A. Sup. Ct. BC 105205) arose from misuse of restraints and denial of medical care to a pretrial detainee who required 15 minute nursing observation but about 5 days later, due the deliberate indifference of the medical staff who ignored his worsening condition, the restraints restricted his circulation causing gangrene to his leg which had to be amputated.

g.  *Roshodesh  v. City of Pasadena*, Case No. BC 428715, a case of deliberate indifference to a  detainee's repeated requests for medical care which was denied because the jail had no medical providers and officers made medical decisions that he was faking and denied him access to timely medical care resulting in a heart attack and injuries.  Defendant's policies were changed so that officers would not make "medical

decisions" and would not delay transporting sick detainees to medical care.

h.    *Anderson v. County of Siskiyou County*, E.D. Cal. Case No. C 10-01428, Siskiyou jail failed to provide reasonable security and acted with deliberate indifference to a mentally disable detainee's need for urgent mental health care, including policies that the psychiatrist defer to custodial staff decisions.   The custody staff also failed to comply with a court order to transport Mr. Anderson to a mental health facility enabling Mr. Anderson's suicide.

i.    *Crawford v. State of California*, C.D. Cal. Case No. CV O9-3956, I was co-counsel in this case arising from CYA Ventura facility's failure to provide reasonable security and mental health care to a juvenile to prevent her attempted suicide resulting in serious bodily injury.   Of importance, I successfully established that in a settlement (as opposed to a judgment), pursuant to *Arkansas Department of Health and Human Services v. Ahlborn*, 547 U.S. 268 (2006), a government lien reimbursement must be reduced in proportion to the ratio of the settlement to the full value of the case (since plaintiff doesn't get full value, nor should the lien holder).

j.    *Craig v. L.A. Sheriff's Department*, Case No. C.D. Cal. CV-05-01711 substantial award for excessive force and   deliberate indifference by deputies to a suicidal mentally ill detainee, causing death.

k.    *Ortega v. County of Los Angeles,* C.D. Cal. Case No. CV 05-2246, alleged ADA violations regarding the death of a disabled detainee who after release from jail sat in the inmate release waiting room for about three days unable to walk and denied medical attention resulting in starvation and death.

l.    *Perkins v Oxnard Police Dept.*, D.C. Cal. Case No. CV 02–0828, arose from the wrongful death of a mentally disable young man when his mother called paramedics for help because he was manifesting suicidal

ideation.   The police arrived and a responding officer fatally shot him while he hid in a closet.   As a result of this case, the Oxnard P.D. changed its policies/procedures and adopted the "Memphis Plan" which trains officers in how to respond to the mentally disable.

m. *Verdekel v. County of Los Angeles*, C.D. Cal. Case No. CV 06-1518 substantial award for wrongful death where jail medical staff was deliberately indifferent and incompetent in medical and mental health care to Heidi Verdekel who was severely disabled and arrested at a county residential home for the disabled for allegedly biting a worker.

n. *Knutson v. County of Ventura*, C.D. Cal. Case No. 02-00817, a substantial award for excessive force in Ventura County Inmate Booking center where Mr. Knutson was severely beaten by jail deputies, and then denied timely medical attention by the jail nurse who observed the beating.

o. *Perez v. County of Ventura*, C.D. Cal. Case No. CV 98-0813 policy changes for the death of a inmate caused by denial of medical attention by jail nurses preventing access to emergency medical care to a sinus infection in order to avoid payment for emergency care at the county hospital.

p. *Hartswick v. Los Angeles Police Department*, C.D. Cal. Case No. CV 04-10269, a substantial award for sexual molestation and assault by police officer   who was responding to plaintiff's 911 call for help to prevent being assaulted by her intoxicated neighbor.

q. *Allen v. Oxnard Police Department*, C.D. Cal. Case No. 97-1560, a substantial award and policy changes for the death of a post auto accident pre-trial detainee in the Oxnard jail by the arresting officer's denial of medical attention to chest injuries causing internal bleeding and death.

r. *Estrada v. City of Riverside* C.D.Cal. ED CV 96-0323 a case stemming from a security guard's beating of plaintiff at a mall, and when police arrived, they delayed plaintiff's serious need to medical care and hospitalization causing serious injury.

s.    *Aquino v. County of Los Angeles*, C.D. Cal. Case No. CV 06-1518, a case alleging deliberate indifference by deputies who abandoned their supervision of a suicidal detainee resulting in his death.

t.    *Diaz v. Orange County Sheriff's Department*, C.D. Cal. Case No. CV 99-2717, Mr. Garcia was arrested for public intoxication and being disoriented.   A video revealed that he was beaten by deputies in his jail cell, while nurses and officers watched.   Medical care was delayed and he subsequently died from the injuries.

25.   I have successfully litigated many other cases regarding jail conditions, including the failure of Sheriff Baca to hold his subordinates accountable and his failure to take corrective measures to abate unconstitutional conduct by his subordinates.

**Professional Lectures, Seminars and Presentations Related to My Expertise.**

26.   I am frequently asked to lecture and speak at law schools and at attorney CLE conferences.   Below are some of the seminars and lectures in which I have participated:

a.    Guest Speaker: "Actualizing Your Passion for Social Justice Through the Private Practice of Human Rights Law."   Santa Clara Law School for the Public Interest and Social Justice Center, San Jose, California, February 17 & 18, 2011.

b.    Panelist: "Basic Introduction to Civil Rights under 42 U.S.C § 1983." University of Puerto Rico, School of Law's Program of Continuing Legal Education, seminar entitled "Substantive Issues and Litigation Techniques in Police Misconduct Litigation." San Juan, Puerto Rico, March 27-28, 2009.

c.    Panelist: "Bringing Justice to Jails." American Civil Liberties Union National Membership Conference, Washington D.C., June 9, 2008.

d.    Presentation: "Legal Standards for Jail Litigation Under Section 1983" the National Lawyers Guild, Amnesty International USA, ACLU

Foundation of Southern California and the Mexican American Bar Association, Los Angeles January 20,2007.

e.  Panelist: "Don't Let the Transactional World Get You Down."   Eighth Annual Trina Grillo Public Interest and Social Justice Law Retreat, Santa Clara University School of Law.   March 12, 2006.

f.  Guest Speaker: "Social Justice Lawyering: Still Rebellious?"   Seventh Annual Trina Grillo Public Interest and Social Justice Law Retreat, Santa Clara University School of Law.   March 12, 2005.

g.  Panelist: "Poverty, Wealth, Status & Inequality: Social Justice Lawyering in Theory and Practice." the Fifth Annual Trina Grillo Public Interest and Social Justice Law Retreat, Santa Clara University School of Law. March 15, 2003.

h.  Panelist: "Law Fellows Program."   U.C.L.A. School of Law, Los Angeles, CA.   Law school Saturday Academies committed to ensuring equity, access, and excellence in legal education.   February 8, 2003.

i.  Guest Lecturer: "Preparing for Trial in Federal Court."   The Latina Lawyers Bar Association, Los Angeles, CA. January 21, 2003.

j.  Panelist: "Civil Remedies for Police Misconduct: Possibilities and Promises of Civil Lawsuits to Remedy Police Misconduct."   U.C.L.A. School of Law, Los Angeles, CA. October 25, 2002.

k.  Guest Lecturer: "Expert Testimony in Police Misconduct Cases."   Police Misconduct Litigation of Suffolk University Law School, Loyola Law School, Los Angeles, CA. February 23, 2002.

l.  Guest Lecturer: "The Importance of Doing Public Interest Work." Annual Trina Grillo Public Interest and Social Justice Law Retreat, Santa Clara University, School of Law, March 25, 2001.

m.  Panelist: "Due Process and the Duty to Protect."   Mathew Bender Continuing Legal Education and the Los Angeles County Bar Association, Los Angeles, CA. October 29, 1999.

n.   Panelist: "The Deliberate Indifference Standard in Rendering Medical Care."   Mathew Bender Continuing Legal Education and the Los Angeles County Bar Association, Los Angeles, CA. October 29, 1999.

o.   Guest Lecturer: "Civil Procedure/Discovery in Federal Court."   The Institute of Jurist, Judges and Prosecutors from Argentina, at Southwestern School of Law, Los Angeles, California, October 26, 1998 and November 9, 1998.

p.   Panelist: "Protecting Civil Rights Under Section 1983."   The National Hispanic Bar Association, Albuquerque, New Mexico, October 1, 1998.

q.   Participant: "Human Rights: a Comparative Study of French and U.S. Human Rights Developments."   The Seminar on Human Rights in the Twentieth Century, at the Sixth Conference of the International Society for the Study of European Ideas (ISSEI), Haifa University, Haifa, Israel, August 16-21, 1998.

r.   Guest Speaker: "Civil Rights in a Growing World Economy."   Columbia University Law School, New York, October 23, 1997.

s.   Guest Lecturer: "Civil Rights - The Distinction Between Deliberate Indifference and Medical Malpractice."   Section 1983 Litigation, Loyola Law School, September 2, 1997.

t.   Guest Lecturer: "Enforcement of Human Rights - The Living Constitution of the United States."   The Summer Institute of Jurist, Judges and Prosecutors from Argentina, Southwestern School of Law, Los Angeles, California, April 17 and May 8, 1997.

27.   Contribution to Published Articles:

a.   R. Samuel Paz and Sonia Mercado, *Legal Standards for Jail Litigation Under Section 1983*. Center for Advanced Legal Studies Seminar, "Police Misconduct Litigation," sponsored by the National Lawyers Guild, Amnesty Internatioanl USA, ACLU Foundation of Southern California and the Mexican Bar Association, at Loyola Law School, January 2007.

b.   Sonia Mercado, *Due Process and the Duty to Protect*, Recent Developments in Police Civil Liability, Mathew Bender (1999).

c.   Sonia Mercado, *Deliberate Indifference Standard in Rendering Medical Care*, Recent Developments in Police Civil Liability, Mathew Bender (1999).

**Published Decisions.**

28.   I have represented clients in a number of cases and appeals which resulted in important favorable published opinions:

a.   *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), is a case pleading individual liability against Sheriff Baca for failure to supervise and take corrective measure regarding his subordinates' ongoing constitutional violations. Sheriff Baca prevailed in a motion to dismiss based on the Supreme Court's opinion in *Iqbal v. Ashcroft* and alleged he could not be sued since he was not "physically present" at the incident.   The 9th   Circuit reversed and the Supreme Court denied certiorari. This was the first opinion by a circuit in the U.S. that squarely held that *Iqbal* should be limited to allegations of racial discrimination and does not apply to allegations of a supervisor's deliberate indifference causing a pattern of practice of constitutional violations.   The Circuit held Plaintiff alleged a claim for relief based on the jail violence of inmate attacks, deputy abuse and the lack of a rigorous follow-up investigation, are part of an ongoing pattern of such incidents in MCJ, and that Sheriff Baca had notice of the pattern of violence by his subordinate supervisors, through reports from his lawyers and agents, and by prior lawsuits and took no action.   The Ningth Circuit held that Starr alleged sufficient facts to name Baca in his personal capacity.   Related reported decisions: *Starr v. Baca*, 2011 U.S. App. LEXIS 2798 (9th Cir. 2011); *Starr v. County of Los Angeles*, 2011 U.S. App. LEXIS 20175 (9th Cir. 2011) (denying en banc review) and *Baca v. Starr*, 2012 U.S. LEXIS 3289 (U.S. Supreme Court, cert. denied).

b.   *Chavez v. Martinez*, Case No. C.D. Cal. CV 98-9313.   Plaintiff prevailed on a Motion for Summary Judgement premised on the violation of his rights protected by the 5th and 14th Amendments to the Constitution arising from a police supervisor's coerced interrogation without giving *Miranda* rights while Plaintiff was in an emergency room undergoing surgery preparation for a critical life threatening condition after being shot to the head, spine and legs by a police officer, resulting in immediate blindness and paralysis.   In *Chavez v Martinez*, 538 U.S. 760 (2003) the Supreme Court held that Plaintiff had a 14th Amendment right of due process and remanded the case, but that he had no Fifth Amendment privilege against self-incrimination because he was not criminally prosecuted. Related reported decisions: *Martinez v. City of Oxnard*, 337 F.3d 1091 (9th Cir. 2003); *Martinez v. City of Oxnard*, 2005 U.S. Dist. LEXIS 3218 (C.D. Cal.). *Martinez v. City of Oxnard*, 229 F.R.D. 159 (C.D. Cal. 2005).   On appeal we received an award of attorney fees. The case ultimately reached a significant settlement.

c.   *Kurt Von Colln, et al. v. Ventura County Sheriff's Department, et al.*, *Von Colln v Ventura County Sheriff Department,* a class action, Case No. CV 97-3896 LGB (CWx), consolidated with CV97-8352 LGB (Cwx), CV 98-3051 LGB (CWx), CV 98-6092 LGB (CWx), and reported at 189 F.R.D. 583 (C.D. Cal. 1999), affirmed on appeal to the 9th Circuit in Case No. 99-56953 (unpublished order affirming granting of preliminary injunction) June 6, 2000.   A case of first impression nationwide enjoining the use of a restraint chair in jail for purposes of punishment and humiliation, causing physical and mental injury to a large percentage of persons with mental disabilities.   The federal district court issued an injunction preventing the unconstitutional use of the chair, and the 9th Circuit Court of Appeal upheld the Injunction.   The case subsequently settled resulting in a Consent Decree which included a monitor and stringent policies and guidelines drafted by Plaintiff's counsel and

Defendant's Sheriff Dept. limiting the use of the restraint chair pursuant to the policies and mandating medical supervision if used.   The jail subsequently stopped the use of the restraint chair.   We received an award of fees.

d.   *Guadalupe Leon, et al. v. San Diego County Sheriff's Dept*., et al., 202 F.R.D.631 (S.D.Cal. 2001).   This was a discovery issue of first impression.   In a jail civil rights case for deliberate indifference to the medical needs of a young man, plaintiffs requested medical peer review records allegedly involving care provided to inmates other than the deceased.   Defendants objected and claimed that the plaintiffs' request sought privileged documents that were not relevant.   In granting the motion to compel, the court held that nursing peer review records could reveal a custom, policy, or practice of the county as well as levels of training provided to the nurses. Further, the documents were not privileged.   The court declined to recognize a federal privilege established by Cal. Evid. Code § 1157, which protected medical peer review records. The court found that recognizing the state privilege in the instant case would do harm to federal substantive and procedural policy. Additionally, no federal peer review privilege existed, and the self-critical analysis privilege did not protect the documents.

e.   *Guadalupe Leon, et al. v. San Diego County Sheriff's Dept., et al.,* 115 F. Supp. 2d 1197 (S.D. Cal. 2000).   Plaintiffs sued the San Diego Sheriff for violations of *42 U.S.C. §1983* civil rights based on defendants' deliberate indifference to decedent's medical condition resulting in his death.   Defendant county and sheriff moved to dismiss under Fed. R. Civ. P. 12(b)(6), alleging that the Sheriff was a state actor and thus had XI Amendment immunity.   In denying the motion, the court held defendant sheriff acted in an official capacity as a policymaker for defendant county when operating the jail and making policy concerning the treatment of inmates needing medical attention; therefore, dismissal under U.S. Const.

Amend. XI was not appropriate on plaintiffs' claim that defendant county's custom, policy, or practice resulted in a constitutional violation. Plaintiffs' complaint directly alleged that defendant sheriff failed to train and supervise, to investigate, and to discipline, which were sufficient allegations against him in his individual capacity to survive a motion to dismiss.

f. *Taylor v. Los Angeles Police Dept.*, 1999 WL 33101661 (C.D. Cal. Nov. 10, 1999). Plaintiffs sought certain police officers' records in a civil rights §1983 case alleging that the L.A.P.D. had a custom and practice of using excessive force and of failing to supervise, train and reprimand officers. The court rejected the L.A.P.D.'s claim of various state privileges in a police brutality civil rights case, noting that only federal common law governs the adjudication of federal rights, holding, "The so-called privileges raised by defendants under various provisions of the California Evidence and Penal Codes are not federal evidentiary privileges and do not warrant discussion."

g. *Jewish Defense Organization Inc. v. Superior Court (Rambam)* 72 Cal.App.4th 1045, 84 Cal.Rptr.2nd 611 (1999). A case of first impression. Defendant (JDO), was a New York resident with no contacts in California but was sued in California Superior Court based on an internet passive web site wherein he commented about the Plaintiff's activities. Plaintiff sued JDO contending that a passive web site from New York which was read in California was substantial "contact" for California to have personal jurisdiction. We filed a "Special Appearance" for JDO challenging jurisdiction on the ground that a passive web site created in New York and read in California does not constitute making oneself available to the jurisdiction of California. The Court of appeals agreed with JDO and held that the creation of a passive Internet web site in New York is insufficient grounds for jurisdiction in another forum, such as California.

h.  *Gruter v Bollinger* 539 U.S. 306 (2003), I provided pro bono representation and donated costs to UCLA School of Law Students of Color in Support of Respondent Lee Bollinger (University of Michigan), and filed an Amici Curiae Brief on their behalf.   This was a landmark case in which the Supreme Court upheld affirmative action admission policies challenged by white plaintiffs alleging the use of race for admission violated their constitutional right to equal protection of the laws.   The UC Law Students supported the University's position that use of race in admissions decisions was a means of achieving a diverse student body and it was a constitutionally sufficient compelling interest in achieving a diverse student body.   The Supreme Court held that the Constitution supported "the law school's narrowly tailored use fo race in admissions decisions to further a compelling interest in obtaining the educational benefits that flow from a diverse student body."

**Billing practices and procedures.**

29.    I take cases on a contingency fee bases because my clients are predominantly indigent.   Although my clients have the option to retain our services on an hourly rate basis, I have never had a client able to pay any hourly fee, nor can they contribute to the extraordinary costs involved in civil rights litigation cases. As in this case, I took all the risk that if my client did not prevail, I would be responsible for all the loss of the time I spent and all costs I paid and my client would pay nothing for our representation.   However, because this is a civil rights case, I also confirmed to my client that if we prevailed, pursuant to 42 U.S.C. § 1988, I would seek an award for reasonable attorney fees and cost.

30.    My billing documentation practice is based on standard legal billing practices in the community.   I have personal knowledge of these practices from working in law firms in my early professional career.   I am computer literate and document all my written work electronically and my billable time is maintained in a program called "Timeslips."   Time spent on working in *Willis v Vazquez* is

memorialized contemporaneously, indicating the date and time of particular entries for tasks performed.

31.    Contrary to standard community billing costs practices, as reflected in my Timeslips Billing Cost Itemization, I do not bill all my standard lawyering activities or costs:

- Lexis-Nexis research costs, which I used routinely in this case;

- telephone calls, except particularly long conferences (e.g. "meet and confer" discovery conferences) held by phone to avoid travel time;

- copying documents, letters, general office copying (except out of office extraordinary copy services);

- faxes received or sent; nor for

- general routine postage.

Of note, I have 3492 e-mails in my Willis account.   I could not possibly bill for all of them, although through the 1.6 years I worked on this case, I had to read and review them.

**Requested Hourly Rate, Fees Incurred and Costs.**

27.    I began my professional career working in law firms in Los Angeles and am familiar with law firm billing practices in this community and nationwide.   I have also co-counseled with attorneys at the firm of Paul Hastings handling an international arbitration matter and reviewed their billing in that case periodically.   Their billing practices and fees charged exceed what I am billing in this case for an attorney of my comparable experience and years in practice. I know that many firms bill in increments of every 15 minutes, and this is considered the general practice.   I bill much more conservatively in increments of every six minutes "(.1)".

28.    For all the above reasons and the accompanying declarations in support, I request a judicial finding that my hourly rate of $770.00 is reasonable and within normal practices of similarly situated attorneys in Los Angeles.

29.    I also spent 8.8 hours preparing this Motion for Fees, my declaration, consulting with and gathering expert declarations regarding reasonable hourly rates, reviewing

˘23˘

my Timeslips billing and request that the Court award me the fees incurred in having to file this Fee Motion in the amount of $6776.00.

30.     I request that the court find that the time I billed in this matter was reasonable. As indicated in the attached Timeslips Billing Statement, Exhibit 15, I spent <u>708.8 hours</u>, in the amount of $545,890; my paralegal billed 56.80 hours in the amount of $11,360.00; and I billed $6776.00 for preparation of this motion for a total in fees in the amount of $563,450.00 in fees.

31.     I also request an award of my actual out of pocket expenses in the amount of <u>$57,853.93</u>.

I declare under penalty of perjury, under the laws of the United State of America, that the foregoing is true and of my personal knowledge.

Executed February 24, 2014, in Culver City, California.

/S/ Sonia Mercado

By: _____

Sonia M. Mercado